## NORTH ATLANTIC & GULF S. S. CO. v. NEW ORLEANS STEVE-DORING CO.

### No. 1456 Admiralty.

United States District Court,
E. D. Louisiana, New Orleans Division.
April 2, 1953.

Terriberry, Young, Rault & Carroll and Benjamin W. Yancey, New Orleans, La., for libelant.

Chaffe, McCall, Toler & Phillips and Leon Sarpy, New Orleans, La., for respondent.

WRIGHT, District Judge.

The libel is based on damage caused by a fire in a cargo of corn aboard the SS Eleazor Wheelock. Libelant, charterer of the vessel, alleges that the respondent, contract stevedore, caused the fire. Respondent asserts the defense of laches together with a general denial. The issues of fact and law having come on to be heard on the pleadings and proofs of the parties and due deliberation having been had, the court now makes the following findings of fact and conclusions of law:

414

### Findings of Fact.

1. Libelant is a corporation organized and existing under the laws of the State of New York. Respondent is a corporation organized and existing under the laws of the State of Louisiana.

2. On April 28 and 29, 1947, libelant was bareboat charterer and owner pro hac vice of the SS Eleazor Wheelock. Before April 28, 1947, libelant entered into a contract with the respondent under which the respondent was to load the SS Eleazor Wheelock with a cargo of bulk corn.

3. In the process of trimming the corn cargo in the holds of the vessel respondent used portable cluster lights. The use, operation and location of these clusters were the sole responsibility of the respondent.

4. At about midnight April 28–29, 1947, while the SS Eleazor Wheelock was lying at the grain elevator in the harbor of New Orleans, the bulk corn, which was loaded by respondent in No. 5 lower hold during the day of April 28, was found to be on fire, smoldering and burning. Upon discovery of the fire the alarm was given and the Fire Department of the City of New Orleans responded. The fire was fought from midnight until approximately 5:00 p. m. on April 29, first by use of the Wheelock's steam smothering line and then by shore personnel of the New Orleans Fire Department.

5. After the fire had been brought under control, two captains of the New Orleans Fire Department entered the lower hold and found a cluster partially embedded in the corn at a point ten feet from the square of the hatch toward the skin of the ship. The cluster was facing downward and outward in the direction of the shell plating in the starboard side of the vessel.

6. This cluster was made up of five sockets or receptacles, each of which had originally contained a 100 watt 120 volt type C Sylvania globe. The cluster when found showed evidence of excessive overheating. The wire cord serving the cluster was burned and the globes in the cluster were broken, obviously from overheating. The cluster when found was completely surrounded by a large mass five feet in diameter of burned corn, some of which adhered to the face of the cluster itself.

7. The place in which the cluster was found was accessible only through an eighteen inch opening between the sloping side of the corn cargo and the under side of the tween deck hatch coaming. The firemen, in order to reach the cluster, had to crawl on their stomachs through this small opening.

8. Upon leaving the No. 5 hold at 5 p. m. on the afternoon before the fire, April 28, the longshoremen employees of respondent did not remove the cluster lights from the hold in order that they would be available for use the following morning without re-rigging. All of the cluster cords, however, with the exception of the one servicing the burned cluster, were disengaged from the switch boxes on deck from which the current to light the clusters was obtained. Further, the longshoremen employees of respondent failed to turn off the switch which would have extinguished the lights on this burned cluster.

9. Although the employees of respondent testified that the switch was turned off and the lights on the burned cluster extinguished, their testimony on this point is incredible for the following reasons:

(1) The switch which turned the cluster in question on and off was not marked to indicate whether the current was on or off.

(2) The cluster was found partially embedded in the corn away from the square of the hatch and facing the skin of the ship. Any light from the cluster in that position would be directed toward the shell plating of the vessel in such manner that it would be impossible for a person standing, as respondent's employees were, in the upper hold or on the main deck to determine whether the cluster was lighted.

(3) Apparently a cluster other than the burned one was extinguished while one Preston, longshoreman employee of respondent, was still in the upper hold. This situation created considerable excitement, including threats to report the matter to the union. Perhaps because of this excitement, the testimony of the longshoreman foreman and the longshoreman employee, Johnson,

who states he turned off the lights, differ on that crucial question. The longshoreman foreman testified that the lights, after having been turned out, were not turned on again to assist Preston in leaving the hold; whereas Johnson testified that he not only turned the lights out once, he turned them out twice, the second time after having switched them back on.

(4) Testimony of the witness Johnson was particularly unimpressive and it differed materially from a statement taken from him prior to the trial and shortly after the fire.

10. Just what happened regarding the cluster lights at the time the longshoremen closed No. 5 hold for the day on April 28th is not entirely clear. The weight of all the evidence establishes the probability, however, that the lights on the burnt cluster were left on. It was the heat from the cluster lights which started the fire in the corn.

11. The night mate of the Wheelock testified that after the longshoremen had closed the No. 5 hatch and covered it with tarpaulin he endeavored to look through the tarpaulin between a crack in the hatch boards to determine whether all lights were extinguished below. He saw no sign of light. He did, however, notice the cord running from the hatch to the switch box on deck. By examining the switch box he could not tell whether the current was on or off and he did not disengage the cord from the receptacle in the box. The night mate testified further that on his hourly rounds of the vessel he was unable to smell fire or see smoke until midnight when the existence thereof was called to his attention by a member of the crew.

12. An expert witness for respondent testified that, while the fire was started by heat from the lighted cluster in the corn, in his opinion the lighted cluster was applied to the corn not more than two hours before the discovery of the fire. His opinion, however, is predicated on an experiment with burning corn performed under conditions dissimilar to the facts found in this case.

13. The efforts on the part of the ship's company to fight the fire after it was dis-

covered has not been the subject of criticism by respondent. The use of the ship's steam smothering system in the first instance was justified in spite of the fact that it was ineffective in extinguishing the fire. When the use of the steam smothering system was abandoned, the responsibility of fighting the fire was undertaken by the New Orleans Fire Department.

14. No prejudice to respondent has been shown as a result of the date of filing of the libel.

## Conclusions of Law.

1. The libel is for breach of a maritime contract and within the admiralty and maritime jurisdiction of the court. 28 U.S.C. § 1333.

2. In performing its portion of the contract, respondent owed libelant the duty of ordinary and reasonable care. As a stevedore, it was required to perform under the contract as a reasonably prudent and experienced stevedore would under the same or similar circumstances. The S. C. L. No. 9, 3 Cir., 114 F.2d 964; Id., D.C., 37 F.Supp. 386, 1939 A.M.C. 1323; The Richelieu, 4 Cir., 48 F.2d 497, 1931 A.M.C. 721; The Robert R., 2 Cir., 255 F. 37; The Evelyn, 2 Cir., 282 F. 250.

3. Leaving the cluster partially embedded in the corn was a violation of respondent's obligation of ordinary and reasonable care in the performance of its duties as stevedore. Failure to extinguish the lights on the cluster was a violation of respondent's obligation of ordinary and reasonable care in the performance of its duties as stevedore. This fault and negligence on the part of the respondent in the performance of its duties as stevedore caused the fire in the corn.

4. Such negligence as may be attributed to the night mate for failure to discover and extinguish the cluster lights prior to the fire would be de minimis as compared to the negligence of respondent. The primary duty of reasonable care connected with the cluster lights was respondent's, and absent a strong showing of culpability on the part of libelant, respondent alone is liable for the damage wrought by the fire. The Richelieu, supra; The Robert.

R., supra; The Jane Anne, 2 Cir., 142 F.2d 197; Id., D.C., 51 F.Supp. 96, 1942 A.M.C. 923.

5. The opinion of one expert cannot overcome the probabilities as proved by the physical facts and the testimony of actual witnesses to the incident in suit. The Richelieu, supra; The S. C. L. No. 9, supra.

6. The defense of laches is not proved, no prejudice being shown and no prejudice can be inferred from the short delay in bringing the libel. Gardner v. Panama Railroad Co., 342 U.S. 29, 72 S.Ct. 12, 96 L.Ed. 31. If state statutes of limitation are to be used by analogy, the statutes relating to contract rather than tort apply. Illinois Central Railroad Co. v. New Orleans Terminal Co., 143 La. 467, 78 So. 738; American Heating & Plumbing Co. v. West End Country Club, 171 La. 482, 131 So. 466; Transportation Equipment Co. v. Younger Bros., Inc., La.App., 34 So.2d 347; LSA–Civil Code, art. 3544.

Let an interlocutory decree be prepared in accordance with these findings.