

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-2-1997

# 2-J Corporation v. Tice

Precedential or Non-Precedential:

Docket
96-1943

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"2-J Corporation v. Tice" (1997). *1997 Decisions.* Paper 236.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/236

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed October 2, 1997

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 96-1943

2-J CORPORATION
t/a DR. FEELGOODE'S,
        Appellant

v.

WILLIAM E. TICE, III,
t/a TICE CONSTRUCTION COMPANY;
JEWELL BUILDING SYSTEMS, INC.

On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. Civil Action No. 96-cv-00090)

Argued: May 8, 1997

BEFORE: STAPLETON and LEWIS, Circuit Judges, and
WALLS,* District Judge

(Opinion Filed October 2, 1997)

        Stephen A. Cozen (Argued)
        Richard C. Bennett
        Deborah M. Minkoff
        Cozen and O'Connor
        The Atrium
        1900 Market Street
        Philadelphia, PA 19103
         Attorneys for Appellant

_____

*Hon. William H. Walls, U.S. District Judge for the District of New
Jersey, sitting by designation.




        John C. McNamara (Argued)
        Butler & McNamara
        1700 Market Street
        Suite 2630
        Philadelphia, PA 19103
         Attorney for Appellee

OPINION OF THE COURT

STAPLETON, Circuit Judge:

We are here asked to resolve whether under Pennsylvania law a commercial purchaser of a pre-engineered warehouse may recover in tort from the manufacturer of the warehouse for damage caused to its contents when the warehouse collapsed. The district court concluded that the Supreme Court of Pennsylvania would interpret the economic loss doctrine as barring tort recovery in these circumstances. We will reverse the district court's grant of summary judgment for the manufacturer and remand for further proceedings.

I.

Plaintiff-appellant 2-J Corporation is a New Jersey corporation engaged in retail sales of spas, swimming pools, and other recreational equipment. In 1987, 2-J hired defendant William E. Tice, III, to construct a building in Bethlehem, Pennsylvania that would serve as a warehouse and provide showroom space for 2-J's inventory. Tice then contracted with defendant-appellee Jewell Building Systems, a North Carolina corporation, to purchase a pre-engineered steel structure to be constructed by Tice on 2-J's premises. Jewell calls its product a "building in a box"; it sent Tice the materials necessary to construct the warehouse and a design plan that Tice followed in erecting the structure. Tice completed construction of the Jewell warehouse for 2-J in December 1987.

2-J used the warehouse until January 17, 1994, when the supports for the roof assembly failed, causing a catastrophic collapse of the warehouse's roof and exterior

2

walls. The warehouse was destroyed. Inventory and other items that 2-J was storing in the warehouse at the time of the collapse were also destroyed. Unfortunately for 2-J, the five-year warranty on the warehouse had expired over a year earlier in November 1992.

Seeking to recover damages for loss of the contents of the warehouse, 2-J initiated this action. It asserted negligence and strict products liability tort claims against Jewell as well as a breach of contract claim based on the warranty. Jewell moved for summary judgment, arguing that tort recovery was barred by the economic loss doctrine, which limits the availability of tort remedies in favor of contract law among commercial parties when products fail to perform as expected. With respect to 2-J's contract claim, Jewell urged that summary judgment was appropriate

because the warranty had expired by the time the warehouse collapsed. The district court agreed with Jewell on both points and granted summary judgment. See 2-J Corp. v. Tice, 926 F. Supp. 55 (E.D. Pa. 1996).

2-J's complaint had also pled claims against Tice. These claims were still pending before the district court following its ruling on Jewell's summary judgment motion. On September 19, 1996, the parties agreed voluntarily by stipulation that all claims against Tice would be dismissed. The district court entered an order dismissing the claims against Tice on November 25, 1996.

2-J filed a notice of appeal on October 16, 1996, seeking review only of the district court's decision to grant Jewell summary judgment on the tort claims. Since there was no final, appealable order until November 25, 1996, 2-J's notice of appeal was premature. However, "a premature appeal taken from an order which is not final but which is followed by an order that is final may be regarded as an appeal from the final order in the absence of a showing of prejudice to the other party." Richerson v. Jones, 551 F.2d 918, 922 (3d Cir. 1977) (emphasis omitted); see also Dowling v. City of Philadelphia, 855 F.2d 136, 138 (3d Cir. 1988). Jewell does not argue that it was prejudiced in any respect by 2-J's premature notice of appeal. Thus, that notice became timely upon entry of the district court's order

dismissing the claims against Tice, and we have jurisdiction to resolve this appeal. See 28 U.S.C. S 1291.1

II.

We exercise plenary review over the district court's grant of summary judgment and over its interpretation of state law. See Blasband v. Rales, 971 F.2d 1034, 1040 (3d Cir. 1992); Compagnie des Bauxites de Guinee v. Ins. Co. of North America, 724 F.2d 369, 371 (3d Cir. 1983). Summary judgment is appropriate only if the record shows no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c).

Our task is to predict what the Pennsylvania Supreme Court would do if presented with this case. See U.S. Underwriters Ins. Co. v. Liberty Mutual Ins. Co., 80 F.3d 90, 93 (3d Cir. 1996). "In attempting to forecast state law, we must consider relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest

court in the state would decide the issue at hand." Aloe Coal Co. v. Clark Equipment Co., 816 F.2d 110, 117 (3d Cir. 1987) (internal quotation marks omitted). "In the absence of guidance from the state's highest court, we are to consider decisions of the state's intermediate appellate courts for assistance in predicting how the state's highest court would rule." Gares v. Willingboro Township, 90 F.3d 720, 725 (3d Cir. 1996).

III.

2-J seeks to recover in tort for damage caused to its inventory and other items that were being stored in the warehouse at the time the warehouse collapsed. The district court predicted that the Supreme Court of Pennsylvania would interpret the economic loss doctrine as barring 2-J's tort claims. We conclude that the

_____

1. The district court had jurisdiction over this diversity action pursuant to 28 U.S.C. S 1332(a).

4

Pennsylvania Supreme Court would not apply the economic loss doctrine to bar recovery in this case.

As it originally developed, the economic loss doctrine provided that no cause of action could be maintained in tort for negligence or strict liability where the only injury was "economic loss"--that is, loss that is neither physical injury nor damage to tangible property. See, e.g., Aikens v. Baltimore & Ohio R.R. Co., 501 A.2d 277, 279 (Pa. Super. 1985); see also J.G. Kassab v. Central Soya, 246 A.2d 848, 854 n.7 (Pa. 1968), overruled on other grounds, AM/PM Franchise Ass'n v. Atlantic Richfield Co., 584 A.2d 915 (Pa. 1990). The quintessential economic loss was lost profits. When a product purchased by a commercial entity failed to perform, that entity's business could be disrupted, resulting in loss of customers, sales, and profits. The economic loss doctrine precluded recovery in tort from the product's manufacturer for these purely economic damages.

In East River Steamship Corp. v. Transamerica Delaval, Inc., 476 U.S. 858 (1986), the Supreme Court interpreted the economic loss doctrine in the context of federal admiralty law as barring recovery in tort to a commercial buyer for damage a product does to itself. The plaintiff, a time-charterer of a supertanker, sued the manufacturer of the supertanker's turbines in tort to recover for damages suffered as a result of the turbines' malfunctioning. The only damage alleged was to the turbines themselves. The

Court viewed the case as requiring it to determine whether a duty should be imposed on manufacturers to protect against commercial products injuring themselves, or whether, instead, this was a matter best left to the parties' agreements and the realm of contract. The Court decided that tort recovery should not be available for harm a product causes to itself. "Obviously, damage to a product itself has certain attributes of a products-liability claim. But the injury suffered--the failure of the product to function properly--is the essence of a warranty action, through which a contracting party can seek to recoup the benefit of its bargain." Id. at 867-68. In the course of reaching this conclusion, the East River Court reaffirmed that a tort remedy remained available for damage to all "other property." Id. at 820.

5

East River constitutes an expansion of the economic loss doctrine because it precludes recovery for what is clearly physical damage to property, i.e., damage to the product itself. See Saratoga Fishing Co. v. J.M. Martinac & Co., ___ U.S. ___, 117 S. Ct. 1783, 1786 (1997). The damage to the product is conceptually distinct from the lost profits that may follow as a consequence of the product's failure. However, the majority of jurisdictions that have considered the question have adopted the reasoning of East River and now deem damage a product causes to itself to be economic loss, non-recoverable in tort. See generally Christopher S. D'Angelo, The Economic Loss Doctrine, 26 U. Tol. L. Rev. 591, 595 (1995).

In the instant case, the district court expanded the economic loss doctrine still further. It held that recovery is also barred for damage to property that foreseeably may be injured if the defective product fails. The court was convinced that such property is effectively "integrated" with the defective product, so that damage to that property is tantamount to damage to the product itself. We do not believe the Pennsylvania Supreme Court would adopt this expansion of the economic loss doctrine.

We have previously predicted that the Pennsylvania Supreme Court would follow the East River approach to the economic loss doctrine. See, e.g., Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 618-21 (3d Cir. 1995); King v. Hilton-Davis, 855 F.2d 1047, 1051 (3d Cir. 1988). The Pennsylvania Superior Court has made the same prediction. See, e.g., REM Coal Co. v. Clark Equip. Co., 563 A.2d 128, 132 (Pa. Super. 1989).

An essential aspect of the East River economic loss

doctrine is that while tort recovery is barred for damage a product causes to itself, such recovery is available for damage the failing product causes to "other property." See 476 U.S. at 867, 870. Pennsylvania Superior Court cases applying East River have explicitly recognized that the economic loss doctrine permits a tort claim for damage to such other property. See, e.g., REM Coal, 563 A.2d at 129. "Tort product liability theories impose responsibility on the supplier of a defective product whenever it causes personal injury or damage to other property because this is deemed

6

to be the best way to allocate the risk of unsafe products and to encourage safer manufacture and design." Id.

East River provides little guidance on how a court should distinguish between damage to "the product," for which tort recovery is barred by the economic loss doctrine, and damage to "other property," for which tort recovery remains available. More recently, however, the Supreme Court has instructed on how that distinction should be drawn. In Saratoga Fishing Co. v. J.M. Martinac & Co., ___ U.S. ___, 117 S. Ct. 1783 (1997), the plaintiff was the second user/owner of a fishing vessel which had, during the plaintiff's ownership, caught fire, flooded, and sunk, all as a result of a defective hydraulic system. When the initial user/owner had purchased the vessel, it had not been equipped for use as a fishing vessel. The initial user/owner had added extra equipment to make the vessel adequate for this purpose. The question the Court addressed was whether the added equipment was part of the "product itself" or "other property." Id. at 1785. The Court held that the added equipment was "other property" and that the economic loss doctrine did not preclude the second user/owner from recovering in tort from the vessel's manufacturer for damage to that equipment.

In reaching its conclusion in Saratoga Fishing, the Court indicated that, for purposes of applying the economic loss doctrine, "the product" is no more and no less than whatever the manufacturer placed in the stream of commerce by selling it to the initial user:

> When a Manufacturer places an item in the stream of commerce by selling it to an Initial User, that item is the "product itself" under East River. Items added to the product by the Initial User are therefore "other property," and the Initial User's sale of the product to a Subsequent User does not change these characterizations.

Id. at 1786. Thus, in the case before it, the product was the vessel as sold by the manufacturer to the initial user. Since the equipment added by the initial user was not part of "the product itself," but instead "other property," a tort remedy was available with respect to the damaged equipment.

The Saratoga Fishing Court started with the proposition that general tort and contract law applicable in the context of commercial sales2 characterizes as "other property" both property added to a defective product by the initial user/owner as well as property used by the initial user/owner in connection with the defective product. It gave three examples: A.J. Decoster Co. v. Westinghouse Elec. Corp., 634 A.2d 1330 (Md. 1994) (owner of chicken farm recovered for chickens killed when the chicken house ventilator system failed); United Airlines, Inc. v. CEI Industries of Ill., 499 N.E.2d 558 (Ill. 1986) (warehouse owner recovered for damages to a building caused by a defective roof installed by the defendant); and Nicor Supply Ships Assoc. v. General Motors Corp., 876 F.2d 501 (5th Cir. 1989) (ship charterer who added expensive seismic equipment to ship recovered for its loss in fire caused by a defective engine). Moreover, the Court noted that the respondents in Saratoga Fishing acknowledged that "had the ship remained in the hands of the Initial User, the loss of the added equipment could have been recovered in tort." Id. at 1787.

The remainder of the Court's analysis in Saratoga Fishing was advanced in support of the proposition that this result should be no different--i.e., the manufacturer should have no greater immunity with respect to foreseeable damage-- as a result of the fortuity that a resale occurred before the defective product caused injury. That analysis ultimately established the time of sale to the initial user as the critical point for determining whether added features are part of "the product itself" or "other property."3

_____

2. Saratoga Fishing, like East River , is an admiralty case. The general maritime law applied by the Court is, as it indicated, "an `amalgam of traditional common-law rules, modifications of those rules, and newly created rules' drawn from both state and federal sources." Saratoga Fishing, 117 S. Ct. at 1786 (quoting East River). The Court accordingly looked to the general law of tort and contract applicable to commercial sales.

3. The Court indicated that the time of sale to the initial user was also the critical one for resolving a related, but distinct, issue--whether in a

suit against the supplier of a defective component part incorporated into a product sold to the plaintiff, "the product itself" is limited to the

8

In our case, we are not concerned with whether features added to a product after the sale to the initial user become a part of the "product itself." We are concerned only with whether property becomes a part of the product itself solely because, after the sale to the initial user, it is foreseeably utilized in connection with the owner's use of the product. Nevertheless, it seems apparent to us that if thefishing equipment foreseeably added to the ship by the initial user in Saratoga Fishing did not become a part of the "product itself," it necessarily follows that the inventory foreseeably stored by the initial user in the warehouse here did not become a part of the warehouse itself. Accordingly, we believe that the district court's "integration" theory in this case is inconsistent with Saratoga Fishing and that it follows a fortiori from the holding in Saratoga Fishing that 2-J can recover for the loss of its inventory and other property stored in its warehouse. For the same reasons we have predicted that the Supreme Court of Pennsylvania would find East River persuasive, we conclude that it would find Saratoga Fishing persuasive as well and allow a tort recovery in this case.4

_____

component supplied by the defendant. The Court recognized the prevailing rule to be that "the product itself" includes all components added before the sale to the initial user. Id. at 1788. We so held in King v. Hilton-Davis, 855 F.2d 1047, 1051-52 (3d Cir. 1988), when we concluded that the bargain struck in the transaction with the initial user "determines his or her economic loss and whether he or she has been injured beyond that loss."

4. We are aware that a number of courts in addition to the district court we are reviewing have ruled that the economic loss doctrine bars tort recovery where the "other property" damaged was always likely to have been injured upon the failure of "the product" itself. See, e.g., Dakota Gasification Co. v. Pascoe Bldg. Systems, 91 F.3d 1094, 1099 (8th Cir. 1996) (applying North Dakota law); Detroit Edison Co. v. NABCO, Inc., 35 F.3d 236 (6th Cir. 1994)(applying Michigan law); Wellsboro Hotel Co. v. Prins, 894 F. Supp 170 (M.D. Pa. 1995)(applying Pennsylvania law); Hartford Fire Ins. Co. v. Huls America, Inc., 893 F. Supp. 465, 469 (E.D. Pa. 1995)(applying Pennsylvania law); Neibarger v. Universal Cooperatives, Inc., 486 N.W.2d 612 (Mich. 1992)(applying Michigan law). However, it is also true that numerous courts have rejected this expansion of the economic loss doctrine. See, e.g., Saratoga Fishing Co.

9

Jewell contends that it is improper to view this case as turning on the issue of whether the contents of the warehouse are "the product" or "other property" for purposes of the economic loss doctrine. Indeed, it acknowledges that 2-J's inventory is not "the product" as normally understood. It insists, however, that the relevant issue presented is "one of delineating the proper spheres of the law of tort and warranty law." Br. at 9. Jewell chooses simply to ignore, however, the fact that East River and Saratoga Fishing, after considering the appropriate functions of tort and contract recovery, concluded in the context of commercial transactions that the proper line to be drawn between the spheres of tort and warranty law is the line between damage to "the product" and damage to "other property." As we have indicated, we are confident that the Supreme Court of Pennsylvania would accept the rationale of East River and Saratoga Fishing.

IV.

Because we conclude that the Pennsylvania Supreme Court would not interpret its economic loss doctrine as barring recovery in tort for damage the collapsing warehouse caused to contents stored within it, we hold that summary judgment should not have been granted to Jewell. Thus, we will reverse the district court and remand for further proceedings in which 2-J may press its negligence and strict liability claims to recover for damage to its "other property."

_____

v. Marco Seattle Inc., 69 F.3d 1432, 1445 (9th Cir. 1995), aff'd on other grounds, ___ U.S. ___, 117 S. Ct. 1783 (1997); Alliance Imaging, Inc. v. Picker Int'l Inc., 1993 WL 76209 (E.D. Pa. 1993); Jet Plastica Industries, Inc. v. Goodson Polymers, Inc., 1992 WL 17207 (E.D. Pa. 1992). We find the latter cases more persuasive, and, particularly after Saratoga Fishing, we are confident that the Pennsylvania Supreme Court would not conclude that the economic loss doctrine precludes recovery for damage to the contents of a warehouse when the warehouse collapses.

10


A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

11